# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. JEREMY J. EDICK

**Appeal from the Circuit Court for McNairy County**
**No. 2764     J. Weber McCraw, Judge**

---

**No. W2012-01123-CCA-R3-CD - Filed June 13, 2013**

---

Jeremy J. Edick ("the Defendant") was convicted by a jury of one count of rape of a child, two counts of aggravated sexual battery, one count of solicitation of rape of a child, and one count of sexual exploitation of a minor by electronic means. Following a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of fifty years' incarceration. On appeal, the Defendant challenges the sufficiency of the evidence regarding his conviction for rape of a child. He also argues that the trial court erred in ordering partial consecutive sentencing. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. D. KELLY THOMAS, JR., J., filed a concurring opinion.

Rickey W. Griggs, Assistant Public Defender, Somerville, Tennessee, for the appellant, Jeremy J. Edick.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Senior Counsel; Mike Dunavant, District Attorney General; and Bob Gray, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A McNairy County Grand Jury indicted the Defendant on one count of rape of a child, three counts of aggravated sexual battery, one count of solicitation of rape of a child, and one

count of sexual exploitation of a minor by electronic means. One count of aggravated sexual battery was dismissed. The Defendant proceeded to a jury trial held on June 20, 2011.

Dr. Lisa Piercey, a pediatrician, testified at the trial as an expert in child sexual abuse. She stated that she had the opportunity to evaluate the victim[1] on October 25, 2010. According to Dr. Piercey, the victim "seemed to be a developmentally appropriate 12-year-old." She continued, "[the victim] seemed very genuine. When I first asked her about the alleged abuse she immediately began crying." The victim told her that the Defendant "touched me on my private" and that he "put his hand and put his private in my butt and rubbed his private on my private." The victim continued that "it would hurt when he put his private inside [my] bottom."

Regarding a time frame for this behavior, the victim told Dr. Piercey that the incidents occurred between March 2006 and December 2008, with the most recent incident occurring in 2008 in Selmer, Tennessee. When Dr. Piercey asked the victim to elaborate, the victim told her that the Defendant "would lick his hand or put lotion on it to get his private wet. She said that white stuff would come out of his private and that he would wipe the white stuff off with a blanket."

From the physical examination, Dr. Piercey observed,

[The victim] had a normal physical exam except being overweight. That's noted in my documentation. The only other abnormality of her exam was during the anal exam and she had an area of what one could refer to as scarring on her anus. If you look at the anal opening like a clock, at around the ten o'clock position there was a flattened, smooth white area like a scar, and that's commonly seen in children that have had anal penetration and that was consistent that it was healed. It was not bleeding or fresh which would be consistent with the last event occurring in 2008.

Dr. Piercey explained that she did not attempt to collect semen or DNA, given the fact that the incident occurred two years prior. She stated that the type of scarring she found on the victim is rare, even for children who have had anal penetration. This scarring was not consistent with someone who simply had a hard bowel movement.

On cross-examination, Dr. Piercey could not give an approximation as to how long the scar had been on the victim. Based on the examination of the scar alone, she only could say definitively that "some type of healed trauma had occurred." However, on redirect

_____

[1] In cases involving child sex offenses, it is the policy of this Court to refer to victims as "the victim."

examination, she stated that nothing other than sexual penetration was provided in the victim's medical history that would have been consistent with this scarring.

Lieutenant Tony Miller with the Selmer Police Department testified that he received an initial report of possible sexual abuse of the victim on June 2, 2010. He then set up a forensic interview with the victim on June 17, 2010. According to Lieutenant Miller, he observed the interview via a video monitor. He estimated that this interview lasted approximately one hour. Based upon his investigation, he developed the Defendant as the suspect in this case.

On cross-examination, defense counsel questioned Lieutenant Miller regarding the four-month delay between the initial report and the physical examination of the victim. Lieutenant Miller was unsure of the reason for the delay. On redirect examination, he confirmed that, had the allegation been closer in time to the filing of the report, he would have taken further steps to ensure a more prompt physical examination. He confirmed, however, that the allegations of abuse were from March of 2006 through the end of 2008.

Investigator Jamie Lowrance with the Hardeman County Sheriff's Department testified that, from approximately April 2008 through August 30, 2010, he worked for the McNairy County Sheriff's Department. He stated that he became involved in the victim's case in June 2010. He was present to observe the forensic interview with Lieutenant Miller through the video monitor. Following the interview, he and Lieutenant Miller spoke with the Defendant and arrested him. He explained that the reason both he and Lieutenant Miller were involved in the case was because

> [s]ome of the incidents were alleged to have happened in the city limits and
> some of them happened out in the county. The county would have jurisdiction
> over all of it, but [Lieutenant] Miller has worked a lot of cases and things and
> he was working the ones in the city and I was working the ones in the county.

The victim's mother ("Mother") testified that she currently was married and had three children, all of whom were daughters. At the time of trial, the victim was twelve years old. Mother identified the Defendant at trial as her brother-in-law, stating that he was married to her sister. In 2005, she moved with her family from Laingsburg, Michigan, to Tennessee, and they initially lived in her parents' home until February 2007. This house, located on L.G. Murray Road, was just outside the Selmer city limits but within McNairy County. In 2007, they moved into a house that was inside the city limits on Moose Lodge Road, where they lived for approximately two and a half years.

Prior to the incidents leading to this case, Mother never had any issues with the Defendant. She had known the Defendant "[s]ince [she] was a little girl." Beginning around November 2007, the Defendant and his wife lived with Mother and her family on Moose Lodge Road for approximately five to six months. She explained that the Defendant "had got [sic] into some financial bindings. They lost their home and we invited them into our home so while they were living in our home they could save money to get back on their feet."

Prior to the Defendant and his wife living with Mother, the Defendant and his wife had moved to the area in 2006. Before they moved in with Mother, the victim had spent time at the Defendant's house, which included spending the night on occasion. Mother also noted that, on occasion, the victim had the opportunity to be alone with the Defendant. At the time, however, it was not concerning to Mother.

Mother described the victim as a "normal" child who, other than "the typical sister rivalry," had no behavioral issues. She first became concerned about the victim on June 2, 2010, when she walked into her bedroom and found the victim viewing pornography on the computer. After speaking with the victim about this behavior, Mother went to her sister's house to discuss the matter. At this time, the Defendant was no longer living with her sister. Mother called law enforcement later that evening, and she also contacted the Department of Children's Services. Soon thereafter, the victim underwent an interview, and, in October 2010, Mother took the victim to see Dr. Piercey for a physical examination. Mother explained that the physical exam was several months later because the victim had relayed to her some new information regarding these incidents.

On cross-examination, Mother verified that the Defendant was working for Southern Towing while he lived with her family. Through his work, the Defendant would be gone for twenty-eight days and then back home for fourteen days. Mother believed that the last time she saw the Defendant was sometime in 2009, but she could not recall the exact date. Mother agreed that she grew up in the same town as the Defendant in Owosso, Michigan. She estimated that the Defendant and her sister entered into a relationship in 2002 or 2003.

Dr. Barton Russell Chase, a physician who practiced in Ramer, Tennessee, testified that, on occasion, he treated the Defendant as a patient. In 2006, the Defendant came to Dr. Chase with a request that moles on his penis be removed. Dr. Chase diagnosed the Defendant with condyloma acuminata, also known as venereal warts. He agreed that these warts can be removed but sometimes come back.

Tamara Edick, Mother's sister and the Defendant's wife ("Ms. Edick"), testified that, before these allegations regarding the victim arose, she already was in the process of obtaining a divorce from the Defendant. However, as of the time of trial, the Defendant had

not yet signed the divorce papers. She stated that she had two children – one living and one deceased. Ms. Edick and the Defendant began living together in 2003 and were married in June 2007. At one point, she and the Defendant lived with Mother's family, along with Ms. Edick's son, daughter-in-law, and their two children. After leaving Mother's house, she and the Defendant began living in an apartment in Selmer, which was where they lived until they separated in October 2008. Ms. Edick confirmed that the Defendant had opportunities to be alone with the victim but that, at the time, she was not concerned.

Ms. Edick was aware that the Defendant owned pornographic movies and magazines. He carried these materials in a black duffle bag, which he took with him on his work trips. She also was aware that the Defendant had venereal warts. Although the Defendant sought treatment for this condition, the warts only lightened in color, "but then they would come back." She did not recall discussing the Defendant's medical condition with Mother until after the allegations surfaced regarding the victim. She acknowledged that the victim may have been present for these discussions, even though the victim did not participate in the discussions.

On cross-examination, Ms. Edick acknowledged that she spent some time with the Defendant on three occasions when he returned to the area after separating with her. She denied having any sexual contact with him during these meetings.

The victim testified that she lived in Selmer with her parents, her two sisters, and her cousins. She identified the Defendant as someone who had given her a "bad touch" before. She identified on a picture of a girl two places where the Defendant had touched her: her front "private" and her "butt." She indicated that the Defendant touched her with his finger and his "front private" – what she called "[h]is goober."

The victim testified regarding instances of sexual contact with the Defendant on several different occasions occurring at different residences. She recalled that the first time he did so was on an evening "[n]ear New Year's Eve" when she was eight years old at her house on L.G. Murray Street. According to the victim, the Defendant called her outside while he was smoking and asked her to "suck his goober," to which she said, "[N]o." Then he asked her to rub it, and she complied.

The next episode of touching between the Defendant and the victim occurred around Thanksgiving when she was nine years old at her family's residence on Moose Lodge Road. Although approximately ten family members were home, she and the Defendant were the only ones upstairs and in his bedroom. He had called her upstairs to watch a movie, and he was wearing pajama pants and a t-shirt. She remembered that he retrieved the movie from his black bag and realized, once he began playing the movie, that it was a "porn" movie. The

victim confirmed that she could see "parts" of the "privates" of people in the movie. While the movie was playing, the Defendant told the victim to pull her pants down, and she complied. She continued, "And then he took his finger and messed with my front private and when that was done, he put his goober in my butt." The victim explained that the Defendant "licked his fingers and wiped it on his private and then put it in [her] butt." According to the victim, the Defendant was moving while his "private" was inside her, something "white" came out of his "private," and this incident hurt her. The victim explained that the man's "private" in the movie was different from that of the Defendant because the Defendant "had bumps on his goober."

Sometime in the spring after the incident in the Defendant's bedroom, the Defendant touched the victim while in a vehicle. The Defendant pulled out his "private" and asked the victim to rub it, and she complied until they arrived at McDonald's. She recalled that the Defendant's "private" still had bumps on it.

Sometime later, Mother "caught [the victim] and [her] little cousin on the computer looking up porn stuff to find out what [the Defendant] done [sic] to [the victim]." Mother got upset with her and then spoke with her once the victim returned from church later that evening. The victim then told her mother about the incidents to which she testified at trial.

The victim confirmed that, in her interview, she said that the Defendant did not put anything inside her. However, she thought she was being asked about her "front" and not her "butt." She confirmed that the Defendant, in fact, did put something in her "butt." The victim also agreed that she told Dr. Piercey about all of these incidents when she went for a physical examination.

On cross-examination, the victim stated that Mother was the first person she told regarding these incidents. She denied telling her cousin about these incidents when he was with her looking at pornography on the computer. The victim estimated that they were looking at the websites for approximately thirty minutes before Mother caught them. According to the victim, she did not tell Mother earlier because the Defendant threatened to kill her.

At the conclusion of the State's proof, the Defendant chose not to testify and presented no proof. The jury deliberated and found the Defendant guilty of one count of rape of a child, three counts of aggravated sexual battery, one count of solicitation of rape of a child, and one count of sexual exploitation of a minor by electronic means.

At the sentencing hearing, the presentence report was admitted as an exhibit without objection, and it is included in the record before us.

The State called Mother to testify at the sentencing hearing. She gave the following statement:

> [The Defendant] wrecked my daughter. [The Defendant] hurt her in several different situations. If I could have protected her, I would have. Threw a lot of turmoil on the family. She's been scared – she's been scared he's going to come back and kill her. She's regressed in age, maturity, anger. It's just put our family through hell and I wrote something up that's more that I've had time to think about it, if I may read it.
>
> . . . .
>
> [Defendant], the night [the victim] told me what you had done to her, I totally had a breakdown. I thought of you as a lot of things but a child rapist was the furthest from my mind. We trusted you as a family member, as my brother and my kids' uncle. Did you hate us this much? You have hurt one of our children. After everything we've done for you, I don't understand and probably never will understand. I know what I wanted to do the minute I found out but that would have been two wrongs and that wouldn't have been – wouldn't have solved anything. I got thinking about it and I've finally come to the conclusion anything I can do or any sentence this Court gives you won't compare even close to what you're facing the day you come face-to-face with your Creator, the Good Lord, and in that I find comfort.
>
> Now, to the Court, I beg you could give sentence as you see fair and so [the Defendant] will never be able to hurt another child.

On cross-examination, Mother acknowledged that a lengthy amount of time existed between the alleged incidents and her learning about these incidents from the victim. She also stated that, until the victim told her about the incidents, she "had no clue" that they had occurred. Since the time that the victim told her about these incidents, Mother had noticed the regression in the victim's maturity.

The victim's father ("Father") provided the following statement to the trial court:

> [Defendant], when you married my sister-in-law, I welcomed you into our family, and then I welcomed you into my home, the one place that my children should be and feel safe. You came in and destroyed everything that a home and a family means. You took what you wanted from my innocent little girl, something that can never be given back, and for that, I will never

forgive you. I have no sympathy for anything that happens to you for the rest of your life and I can only hope that this Court shows no mercy on you, because, God knows, I wouldn't have.

At the conclusion of the sentencing hearing, the State requested that the trial court run the sentences consecutively because these convictions related to separate instances which occurred over an extended period of time. The trial court considered the presentence report, the victim impact statement, the evidence presented at trial, the statements given at the sentencing hearing, and "the nature and characteristics of the criminal conduct involved." The trial court noted that the State and the defense agreed that the Defendant was to be sentenced as a Range I, standard offender. The trial court did not apply any enhancement or mitigating factors to the Defendant. Given all the court's findings, the trial court sentenced the Defendant to twenty years on the rape conviction, ten years on both aggravated sexual battery convictions, ten years on the solicitation of rape of a child conviction, and three years on the exploitation of a minor by electronic means conviction. The trial court ran all of these sentences consecutively to each other, except for the three-year sentence for the exploitation of a minor by electronic means conviction, which the court ran concurrently to the other sentences. Thus, the trial court imposed an effective sentence of fifty years' incarceration.

Regarding consecutive sentencing, the trial court found the following:

[T]he Court is going to find some of these should be consecutive, some concurrent. The Court does find that the defendant was convicted of two or more statutory offenses which involve sexual abuse of a minor. The Court considers the relationship between the defendant and the victim, the time span of this undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual physical and mental damage to the victim or victims.

The Defendant filed a motion for new trial, which the trial court subsequently denied. At the hearing on the motion for new trial, the Defendant challenged the sufficiency of the evidence supporting his convictions and his sentence. On appeal, the Defendant challenges the sufficiency of the evidence only for his rape of a child conviction. Additionally, he asserts that the trial court erred in ordering consecutive sentencing.

## Analysis

### Sufficiency of the Evidence

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

-8-

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The Defendant challenges the sufficiency of the evidence only as to his conviction for rape of a child. Rape of a child is defined by statute as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (Supp. 2005).

The victim testified at trial that, when she was nine years old, the Defendant asked her to go upstairs to watch a movie with him in the bedroom where he was staying while living with the victim's family. Once he began playing the movie, the victim realized that it was a "porn" movie. While the movie was playing, the Defendant told the victim to pull her pants down, and she complied. She continued, "And then he took his finger and messed with my front private and when that was done, he put his goober in my butt." The victim explained that the Defendant "licked his fingers and wiped it on his private and then put it in [her] butt." According to the victim, the Defendant was moving while his "private" was inside

her, something "white" came out of his "private," and this incident hurt her. The victim explained that the man's "private" in the movie was different from that of the Defendant because the Defendant "had bumps on his goober."

Dr. Piercey also testified at trial regarding her physical examination and discussion with the victim about these incidents. The victim told her that the Defendant "touched me on my private" and that he "put his hand and put his private in my butt and rubbed his private on my private." The victim continued that "it would hurt when he put his private inside [my] bottom." From her examination, Dr. Piercey observed,

> [The victim] had an area of what one could refer to as scarring on her anus. If you look at the anal opening like a clock, at around the ten o'clock position there was a flattened, smooth white area like a scar, and that's commonly seen in children that have had anal penetration and that was consistent that it was healed. It was not bleeding or fresh which would be consistent with the last event occurring in 2008.

Dr. Piercey stated that the type of scarring she found on the victim is rare, even for children who have had anal penetration. This scarring was not consistent with someone who simply had a hard bowel movement. Based on the examination of the scar alone, she only could say definitively that "some type of healed trauma had occurred." However, on redirect examination, she stated that nothing other than sexual penetration was provided in the victim's medical history that would have been consistent with this scarring.

The Defendant claims that the jury should have discredited the victim's testimony, given that the victim did not disclose the information regarding this penetration in her forensic interview. At trial, the victim acknowledged that the only touching of her "butt" that she disclosed at the forensic interview was that the Defendant "would sometimes . . . hit it like not for discipline, just for like playing around." She did not discuss at the interview the details involving the alleged penetration. On redirect examination, however, the victim agreed that the interviewer never specifically asked her whether the Defendant ever put anything inside her "butt." To the extent the Defendant argues that the jury should have discredited the victim's testimony regarding the penetration, we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655. Therefore, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of rape of a child. Accordingly, the Defendant is entitled to no relief on this issue.

*Consecutive Sentencing*

The Defendant also challenges the trial court's issuance of partial consecutive sentencing. Our supreme court recently has directed that we review felony sentences imposed pursuant to the 2005 amendments to the 1989 Sentencing Act "under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). The effective sentence at issue in Bise was the result of several sentences ordered to be served concurrently. Id. at 687 n.5. The supreme court has not yet addressed directly what impact, if any, its decision in Bise has on our review of consecutive sentences. However, in State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), in which the supreme court expressly extended the Bise standard of review to questions related to probation or any other alternative sentences, the court also cited with approval the case of State v. Henry Floyd Sanders, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012), perm. app. granted (Tenn. Feb. 15, 2013). Caudle, 388 S.W.3d at 278. Sanders cited to the Bise language in stating the applicable standard of review on the issue of consecutive sentencing. Henry Floyd Sanders, 2012 WL 4841545, at *15. Additionally, the supreme court recently granted the State's application for permission to appeal in State v. James Allen Pollard, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253 (Tenn. Crim. App. Sept. 17, 2012), perm. app. granted (Tenn. Feb. 13, 2013). In Pollard, a panel of this Court reversed a trial court's imposition of consecutive sentencing and remanded the case to the trial court for further findings. Id. at *21.[2]

Moreover, in Bise, our supreme court stated that "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant." 380 S.W.3d at 708. We note that the relevant Tennessee statute allows appellate review of the following within the context of sentencing: "the length, range or the manner of service of the sentence" as well as "the imposition of consecutive sentences." Tenn. Code Ann. § 40-35-401(a) (Supp. 2005). Therefore, all other components of the "imposition of sentences" are reviewed under this abuse of discretion standard, Bise, 380 S.W.3d at 708, and we see no reason for the imposition of consecutive sentencing to be treated differently. Thus, based upon Bise and Caudle, we conclude that the abuse of discretion standard with a presumption of reasonableness applies to appellate review of consecutive sentencing.[3]

---

[2] We further note that a panel of this Court also expressly extended the Bise standard of review to misdemeanor sentencing. See State v. Michael Snodgrass, No. E2011-02637-CCA-R3-CD, 2013 WL 785057, at *5 (Tenn. Crim. App. Mar. 1, 2013).

[3] We acknowledge that other panels of this Court have held otherwise. See, e.g., State v. Ricky Earl Genes, No. M2012-02284-CCA-R3-CD, 2013 WL 1395290, at *6 (Tenn. Crim. App. Apr. 8, 2013).

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (Supp. 2005).

The Criminal Sentencing Reform Act of 1989 provides that a trial court may order consecutive sentences on any one or more of several statutory bases. See Tenn. Code Ann. § 40-35-115(b) (2003). One of those bases is that a preponderance of the evidence establishes that the

defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(2). In addition to this criterion, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); see also Tenn. Code Ann. §§ 40-35-102(1) (Supp. 2005), -103(2) (2003); In re Sneed, 302 S.W.3d 825, 828-29 (Tenn. 2010).

In ordering partial consecutive sentencing, the trial court found the following:

[T]he Court is going to find some of these should be consecutive, some concurrent. The Court does find that the defendant was convicted of two or more statutory offenses which involve sexual abuse of a minor. The Court considers the relationship between the defendant and the victim, the time span of this undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual physical and mental damage to the victim or victims.

The trial court also noted that it had considered the pre-sentence report, the victim impact statement, the evidence presented at trial, the statements provided at the sentencing hearing, and "the nature and characteristics of the criminal conduct involved." Given that the Defendant was convicted of numerous offenses involving the sexual abuse of a minor, as well as the other considerations taken by the trial court, we hold that the trial court imposed these sentences in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Thus, the trial court did not abuse its discretion in imposing consecutive sentencing. Moreover, even under the standard of review of de novo with a presumption of correctness, we would affirm the trial court's consecutive sentencing in this case. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

-13-